```
                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,.    Case No. 5:20-CR-00328-JDW-1
                            .
              Plaintiff,    .
                            .
        v.                  .
                            .   Philadelphia, PA 19106
LUIS PEREZ-RODRIGUEZ,                          .
                            .
              Defendant.    .   Courtroom: 12B
                            .   September 13, 2022
. . . . . . . . . . . . ..   1:40 p.m.

                   TRANSCRIPT OF SENTENCING HEARING
                  BEFORE HONORABLE JOSHUA D. WOLSON
                  UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For USA:                    BRITTANY A. JONES, ESQ.
                            U.S. ATTORNEY'S OFFICE
                            615 Chestnut Street
                            Philadelphia, PA 19106


For LUIS P-RODRIGUEZ:       PHILIP D. LAUER, ESQ
                            PHILIP D. LAUER, PC
                            701 Washington Street
                            Easton, PA 18042


FOR US PROBATION OFFICE: LESLIE MAXWELL


COURTRROOM CLERK:           L.B. ROBERTS

Transcriber:                UBIQUS REPORTING, INC.
                            61 Broadway, Suite 1400
                            New York, NY 10006
                            212-346-6666
                            Email: infousa@ubiqus.com



              Proceedings recorded by electronic sound
        recording, transcript produced by transcription service.
```

**I N D E X**

|  | PAGE |
|---|---|
| INTRODUCTORY REMARKS BY THE COURT | 1 |
| THE GOVERNMENT ADDRESSES THE COURT | 8 |
| DEFENSE COUNSEL ADDRESSES THE COURT | 19 |
| DEFENDANT ADDRESSES THE COURT | 27 |
| US PROBATION OFFICER ADDRESSES THE COURT | 30 |
| JUDGE WOLSON'S SENTENCING STATEMENT | 31 |

1          COURTROOM DEPUTY:  Hi, ladies and gentlemen.  Before

2   Judge Wolson comes out onto the bench, just make sure your cell

3   phones are silent.  All rise.  United Stated District Court for

4   the Eastern District of Pennsylvania is now in session.

5   Honorable Joshua D. Wolson presiding.

6          THE COURT:  Good afternoon, everybody.  Have a seat,

7   please.

8          MR. PHIILIP LAUER:  Good afternoon, Your Honor.

9          MS. BRITTANY JONES:  Good afternoon, Your Honor.

10         THE COURT:  All right.  All right.  So we're here on

11  sentencing in United States versus Perez-Rodriguez which is

12  Number 20-cr-328.  So I guess I'll just start with the

13  appearances of counsel, if I could.

14         MS. JONES:  Yes, Your Honor.  Good afternoon.

15  Brittany Jones on behalf of the government.  Also here at

16  counsel table is Special Agent Christopher Duncanson [phonetic]

17  with the FBI.

18         THE COURT:  Definite.  Okay.

19         MR. LAUER:  Good afternoon, Your Honor.  Attorney

20  Philip Lauer for the Defendant, and Mr. Perez-Rodriguez is here

21  with me in court.

22         THE COURT:  All right.  Definite.  All right.  And we

23  have Ms. Maxwell from Probation.  Good afternoon.

24         MS. LESLIE MAXWELL:  Good afternoon, Your Honor.

25         THE COURT:  Okay.  Let me just -- a little bit of

1  housekeeping just as a starting point.  Mr. Lauer, there was

2  over this summer a motion to seal your sentencing memorandum

3  which I granted in part and, and gave some instructions to file

4  a redacted version on the public docket and I don't think that

5  ever happened.  So just when we finish up here, I'll appreciate

6  if you would, would put it on the docket.

7          MR. LAUER:  I will do it, Your Honor.  I have an

8  explanation, but it doesn't matter.  It didn't get done.  My

9  apologies.

10          THE COURT:  It's okay.  I mean, it's -- you know, but

11 as I said, I like things to be on the docket when -- I think

12 it's important that things be done as much as possible in the

13 way that they -- so just, you know, by like the beginning of

14 next week if you can get it on the docket with the redactions,

15 I'll appreciate it.

16          MR. LAUER:  I will, Your Honor.

17          THE COURT:  Okay.  All right.  All right.  Mr. Prez-

18 Rodriguez, you know why we're here today?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  Okay.  And so from your perspective, is

21 there any reason that we should not be going forward today?

22          THE WITNESS:  No, Your Honor.

23          THE COURT:  Okay.  All right.  So let me ask counsel

24 if you have all received copies of the prison's investigation

25 report with its revisions which I believe is dated June 8th of

1    2022.  Ms. Jones, do you have that?

2              MR. LAUER:  Yes, Your Honor.

3              MS. JONES:  Yes, Your Honor.

4              THE COURT:  All right.  And so, Mr. Perez-Rodriguez,

5    did you get a copy of that report?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  All right.  And have you read it?

8              THE WITNESS:  Yes.

9              THE COURT:  How many times have you read it?

10             THE WITNESS:  Several.

11             THE COURT:  Okay.  And have you reviewed it with Mr.

12   Lauer?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  Have you reviewed it with anyone other

15   than Mr. Lauer?

16             THE WITNESS:   No, your Honor.

17             THE COURT:  Okay.  Has Mr. Lauer answered all your

18   questions about the report?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  Okay.  So as we sit here now, do you need

21   any additional time to discuss the report or get any questions

22   about it answered?

23             THE WITNESS:  No, sir.

24             THE COURT:  Okay.  So then Mr. Perez-Rodriguez, I

25   guess my next question is, is there anything that's in the

1   report that you think is incorrect and you think might be

2   harmful to your position here?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  Okay.  Is there anything that you would

5   want added to the report because you think it's helpful but

6   it's not in there?

7          THE WITNESS:  I can't think of it at the time, sir.

8          THE COURT:  Okay.  All right.  All right.  So let me

9   ask counsel; the prisons investigation report calculates a

10  total offense level of 52; does the government agree with that,

11  Ms. Jones?

12         MS. JONES:  Yes, Your Honor.  We have no objections

13  to the sentencing guidelines as calculated by Probation.

14         THE COURT:  Mr. Lauer?

15         MR. LAUER:  The same, Your Honor.

16         THE COURT:  Okay.  And so everyone is in agreement as

17  well with the calculation of criminal history category of 1?

18         MS. JONES:  That's correct, Your honor.

19         MR. LAUER:  Yes, Your Honor.

20         THE COURT:  Okay.  And does anyone have any -- let me

21  start with the government.  Any corrections to the report; not

22  objections, just corrections.

23         MS. JONES:  No, Your Honor.  We have no corrections

24  to the report.

25         MR. LAUER:  No, Your Honor.

1          THE COURT:  So with the guideline calculation as I

2    understand it, would be a life sentence, but the statutory

3    maximums are below that.  So as I understand it then, we're

4    talking about a sentence that's up to 2,400 months which is

5    basically the sum of the various statutory maximums in terms of

6    the guideline range.  Does everyone agree with that?

7          MS. JONES:  Yes, Your Honor.

8          MR. LAUER:  I do, Your Honor.

9          THE COURT:  All right.  And then are there any other

10   objections to the report from the government?

11         MS. JONES:  No objections from the government.

12         THE COURT:  Mr. Lauer?

13         MR. LAUER:  No objections.

14         THE COURT:  Okay.  All right.  So I've read the

15   sentencing memos that I've received including there was the one

16   victim's letter from the government which I, which I think I

17   ordered to be under seal.  If it hasn't the docket, it's going

18   to.  And then I now read the psychologist evaluation.  But --

19   so let me -- with all that in mind and knowing that I've sort

20   of looked at it and studied it, Ms. Jones, I'll just turn to

21   you and ask for your views on sentencing.  I may have a couple

22   of questions for you specifically as restitution when you're

23   done, but let me hear sentencing with large first.

24         MS. JONES:  Absolutely, Your Honor.  Okay.  Your

25   Honor, the government is requesting that this court impose a

1  guideline sentence in this case which is the equivalent of a

2  life sentence for this defendant.  And I don't stand up here

3  this afternoon and ask that lightly.  I went over to great

4  detail and a sentencing memorandum about why we view this case

5  as a life case, but I just want to point out just a -- point

6  out and highlight a few things today.

7          When we're looking at the sentencing factors laid out

8  and 3553(a), we have to start there.  So I want to talk about

9  the nature and circumstance of the offense just a little bit.

10         Mr. Perez-Rodriguez stands here today having pled

11 guilty of four counts of manufacturing of child pornography and

12 four counts of distribution of child pornography.  The

13 production and manufacturing of child pornography is a very

14 heinous and grave offense, and the production in this case does

15 warrant the equivalent of a life sentence.  The Defendant chose

16 to victimize and sexually abuse his own daughters who at the

17 time were just the ages of three and 10 years old.  He molested

18 them and abused them while they slept, including that he

19 masturbated over the 10-year old's face.  He took pictures of

20 the three-year-old while her vagina was spread open while her

21 diaper was still visible underneath her.  These actions, if

22 another themselves, are horrific.  But he didn't just do those

23 things.  The photographs and videos that he took of his

24 victims, he entered into KickChat and which he distributed

25 them.  He told participants in the chat that these were his

1  children.  He engaged in messages about them asking tips on how

2  to progress in his abuse of his daughters.  He gave them

3  permission to share these images.  He said, "LOL, I'll share

4  anything.  It don't matter to me," on April 28th, 2020 while

5  chatting with another member of this KickChat.

6          These -- the sexual abuse and molestation of his

7  daughters is forever memorized and available for other sex

8  offenders online to see, to view, to use, to share, to gratify

9  themselves with, and that can never be undone.  They can never

10 be completely freed from what this defendant did to them.

11         The Defendant was a father to these girls.  He was in

12 the home with them, he raised them, they trusted him, he was an

13 important figure in their life and he abused that trust and

14 that relationship with the victims, their mother and that

15 entire family.  Again, they were very young at the time, only

16 three and 10 years old and you have to take into account the

17 aggravating factor that these prepubescent girls depending on

18 defendant and he chose to sexually abuse them while they slept.

19         The chat that we quoted at length in our sentencing

20 memorandum point out the extent of the Defendant's interest in

21 child pornography in producing it and in sharing it.  We're

22 talking about his daughters.  And he first disclosed he had a

23 three-year-old daughter.  He said, "Got a three-year-old

24 daughter, I'm waiting a few years to try anything, got any

25 tips?"  Another chatter gave him some suggestions and he

Proceedings                                    10

1    followed up with questions asking whether or not he should have

2    the daughter touch his penis.

3            And those chats more than anything else shows the

4    Defendant's true nature and interest and no one was looking

5    that he is a child predator and an abuser who is interested in

6    sexually abusing children.

7            I do want to talk about the history and character of

8    the Defendant as I know from the defense sentencing memorandum

9    that they will be requesting the mandatory minimum on one count

10   of manufacturing which will be 15 years of imprisonment.  And

11   there is a line in the defense memo about his lack of criminal

12   history.  The hired expert's opinion of the Defendant is a

13   moderate risk of reoffending and also a lot to be made about

14   the variations and sentencing when it comes to child

15   exploitation offenses.

16           I do want to point out to this court that the

17   Defendant is not in a special circumstance of having a lack of

18   a prior criminal history.  That's not unusual in child sex

19   offense cases and in fact, it's already be accounted by the

20   sentencing guidelines that nobody had any objection to for his

21   criminal history score.

22           In this case, the Defendant had two victims that he

23   violated multiple times in a pattern of about a week's span.

24   That highlights just the egregiousness of this particular crime

25   and it warrants a guideline sentence.  We pointed out in our

1  sentencing memorandum that what the government is asking for

2  today, while it may be a lot, if not outside of the realm of

3  possibility, we pointed out with a list of cases that even in

4  this very district, child sex offenders who are producing child

5  pornography get significant sentences.

6          We also pointed out that the 2021 Federal Sentencing

7  Pornography Offense study supports a very lengthy sentence much

8  more than the 15 years the Defendant is asking for.  That

9  report pointed out that on average 235 months is the sentence

10  for production generally and then it escalates for all

11  escalating factors, all of which are present in this case.  289

12  months for offenses that involve child pornography offenses

13  like the distribution here.  220 -- sorry, 292 months for

14  prepubescent children.  And for parents, 340 months.  That is

15  far more than the 15 years the Defendant is asking for today.

16          I'd also like to briefly talk about the psychosexual

17  evaluation.  I realize that Dr. DiTullio is not here today, but

18  I do want to point out some things I noticed about the study --

19  his report, I apologize.  In conducting his evaluation of

20  defendant, his paid hired expert accepts many things the

21  Defendant says at face value.  With no additional probing, he

22  readily accepts defendant's claim that he is not sexually

23  attracted to children, that he's attracted to adult women and

24  older teens mostly only.

25          When asked how he could masturbate over his

1  prepubescent daughter, he simply said self-stimulation and

2  that's just accepted in the report.  There's no long discussion

3  of his contact or history around children in that report and no

4  real explanation of how he ended up in these chat rooms to

5  begin with.

6          The Defendant tells his expert that he basically was

7  bored during the pandemic and wandered in there.  You will

8  think that if someone wasn't interested in child pornography

9  and they end up in a child pornography chat, they would close

10 those, not continue on in the chat, message other members and

11 produce child pornography to share.

12         Dr. DiTullio's own assessment in his

13 psychodiagnostics profile of the Defendant starts on, I believe

14 it's Page 13.  He notes that the Defendant is very manipulative

15 and at depth at winning over favor, but he fails to account for

16 how he could have possibly control for this in his assessment

17 of what he did to counteract those methods.  He also says that

18 the Defendant was participating in these chats in other to

19 receive pornography of older teen females masturbating, and yet

20 nothing in what we have -- nothing in the chats supports that,

21 leading to the question of whether or not the doctor fully read

22 the full chats or just accepted what the Defendant said at full

23 face value.

24         He claims that there is no contact offense, but does

25 not explain how spreading a three-year-old's vagina open to

1   photograph and share is not contact, how masturbating over a

2   10-year old's face and smearing the substance whether semen or

3   smith -- spit is not contact.  He just really accepts whatever

4   the Defendant says for it is and says it is not for his sexual

5   arousal.

6           Even with all these latitudes that the expert gives

7   him, his own hired expert still says that he's at moderate risk

8   for offending, not a low risk.  Who knows what the actual

9   assessment would have been had he followed up on some of these

10  areas when we're talking about the sexual abuse of children and

11  what the Defendant's real sexual productivities are.

12          Also in his assessment, he recommends that the

13  Defendant participates in sex offender treatment, but notably

14  also recommends that he continued treatment after whatever time

15  he is released from BOP.

16          The Defendant is sitting here facing at least a 15-

17  year mandatory minimum and his own expert is saying after being

18  in prison with 15 years of treatment, he needs to be on

19  supervision.  He mentions a halfway house, he mentions a three-

20  quarter way house, he says that the long tail is revision and

21  even mentions polygraph test.  That doesn't sound like someone

22  who's at moderate risk or who has no real interest in the

23  sexual abuse of children.

24          Next, the doctor and the defense in both -- in their

25  print material submitted to the Court talk a lot about the

1  Defendant accepting full responsibility for his actions.  But

2  I'd like to point out, yes, the Defendant has pled guilty and

3  has not put his victims through the burden of going through a

4  trial, but he's never really accepted full responsibility for

5  everything that has happened in this case.  On the scene of the

6  search of his house when he was talking to the agents, tried to

7  provide an excuse for why there were photos of his three-year-

8  old saying that he had -- they were diaper rash photos that he

9  had posted in the chats on accident.  When you look at the

10 chats, that is not at all what happened.  A user asked him,

11 "Bet the three-year-old has a nice job [inaudible]?"  The

12 Defendant told him, "Yeah, it is.  Do you want pics?  That

13 would probably be easy AF."  Those were no accident.  He did

14 not take full responsibility.  He discussed at length taking

15 these photos of his three-year-old and posting them into the

16 chats.

17         The Defendant is his true self in those chats where

18 he happily asks for tips on how to sexually abuse his

19 daughters, where he talks about arranging for others to join

20 them -- join him in abusing his daughters, he talks about

21 drugging them to make the task easier.  He generally talks

22 about his whereabouts and for a future meetup and only leaves

23 this chat because he is scared of getting caught by his

24 partner.  That is defendant's true self.  He is truly sexually

25 interested in abusing children and the crimes he has committed

1   warrant a guideline, guideline life equivalent sentence.

2           The seriousness of this offense, as I'm talking about

3   it for a lot, but it really needs to be pointed out; this is

4   the most serious offense.  He sexually abused his daughters, he

5   photographed them, he distributed it to others, he told them to

6   share it, he asked for tips.  There is nothing else for him to

7   do.  This is the most serious in offense.

8           If the Defendant today were only to receive a 15-year

9   sentence as the defense requests, he's a relatively young man

10  in his 30s now, he'll still be relatively young in 15 years.

11  He won't even have reached the age of 50.  And what is that to

12  say that he will not reoffend?  All of the things that their

13  own expert mentioned that have to go right for him to be at a

14  moderate risk of reoffending, what is to stop him from creating

15  another family and abusing them as well?  This is a life

16  equivalent case.  The harms this defendant has perpetuated

17  against his own daughters has earned him this [inaudible]

18  sentencing guidelines which call for life and his crime that's

19  outlined in our written memorandum and what I've talked about

20  today and for this court -- before this court support that as

21  well.

22          The harm from this defendant that he has perpetuated

23  on his daughters, his partner, their family, can never been

24  undone.  That's out there forever.  Once something's online,

25  you can't take that back.  They have to live with that and know

1    they can never get that back.  The pain was way too much for

2    his family to even come to this sentencing today.  The mother

3    told us that she won't be able to handle it.  They just

4    couldn't be able to face it in person because that is how much

5    this is lifechanging for those girls, for that family.  And I

6    just -- it's hard to impress on the Court just how much this

7    has changed their world, but I would just like to read just in

8    full the victim's letter for the Court on the record.

9              THE COURT:  I have no problem if you do that.  Can

10   you obscure the names right under seal in this portion of the

11   transcript?  I mean, I've read the letter and the letter is

12   under seal.

13             MS. JONES:  Oh, understood, Your Honor.

14             THE COURT:  Yeah.  Okay.

15             MS. JONES:  "Judge Wolson, my daughter, Minor 1 grew

16   up to the age of three without a father or any type of father

17   figure when I met the Defendant.  It didn't take her long to

18   consider him her father, no one pushed that she chose to call

19   Luis, dad.  After -- but instead of being a real father, he

20   became a monster she feared.  Minor 1 still refuses to say the

21   name Luis.  She still doesn't like to talk about the things

22   Luis did to her.  She trusted him and he took advantage of that

23   in the worst way possible.  Minor 1 has always loved the

24   saxophone and played since a very young age.  After everything,

25   Minor 1 lost her drive to play it, it took her over a year to

1    want to play again.  She was always such a very happy and

2    outgoing child who loves to see everyone around her just happy.

3    It took so much work just to get her to trust talking to any

4    type of male figure again.  I had to change all of her classes

5    at school to make sure she only had female teachers.  Minor 1

6    has done so much work in therapy to be better because of what

7    Luis has done to her.

8           Minor 2 is the only biological child me and Luis have

9    together.  She was still a baby at the time, three years old.

10   She always was such a happy, playful little girl so much like

11   her big sister.  Once Luis was removed, she refused to potty

12   train, had multiple tantrums to the point I had to take her out

13   of daycare.  Before Luis was locked up, he kept Minor 2 to home

14   with him all day.  She has no social skills; she was terrified

15   of being around new people.  My own mother trusted Luis and

16   considered him her own son, is sick and here to find out the

17   things he had done to the girls.  My brother had no male

18   figures around and my father had passed at a very young age for

19   him.  My brother looked up to him and it broke him and my

20   brother -- it broke him.  My brother went to him with

21   everything.  It scared him to think he could be so close to

22   someone who could even think of the things Luis did.  I spent

23   six years with someone I thought I knew better than I knew

24   myself and I was completely wrong.

25          Luis is nothing but a narcissistic monster who would

1   do anything to get anything he wants no matter who it hurts.

2   He looks out only for himself, that's clear by his actions.  He

3   has no respect for anyone's boundaries, not even for once he

4   said he has for himself.  To hear the things he did to my

5   girls, I have no words to describe what I feel.  I still fear

6   now leaving my girls with anyone, that includes family.

7              The charges Luis has pled guilty to are some of the

8   most horrible things a man or father could do to two girls he

9   calls his daughters.  I feel that Luis does deserve the maximum

10  sentence for what he's done.  Who knows how much further Luis

11  would have taken this if he wasn't caught?"

12             Your Honor, in the government's opinion, the actions

13  that this defendant committed against his victims warrants the

14  equivalent of a life sentence.  I know the Court had a question

15  about restitution, there's been no request for restitution from

16  the victims.

17             THE COURT:  Okay.  And so as I understand it under

18  the statute, then restitution is mandatory in the amount of

19  $3000 per victim at a minimum, and so you know, I've had some -

20  - I've seen it where we defer restitution, but in this case, I

21  think the government's view is I should just award the $3,000

22  per victim; is that where we're at?

23             MS. JONES:  Yes, Your Honor.

24             THE COURT:  Okay.  Okay.  All right.  Mr. Lauer.

25             MR. LAUER:  Your Honor, respectfully, it's hard to

1    respond to that.  I understand counsel's obvious anger.  I

2    understand that it's an offense that is offensive to everyone.

3    And I think, I think it misrepresents frankly the fact that

4    this gentleman hasn't taken responsibility, for at least that's

5    what I understood the government to be saying.  I've had

6    contacts with him many times while he was in Lehigh County

7    while he was in Philadelphia.

8            This is somebody who honestly in my experience has

9    essentially struggled with how this happened, how did this come

10   about.  Because although counsel will have you essentially

11   disregard this; he doesn't have a criminal history.  He hasn't

12   been a violent person; he hasn't been a dishonest person.

13           THE COURT:  But why are those things linked to his

14   charges anyway?  Why, why would it matter?

15           MR. LAUER:  Because I think part of what you're

16   required to do under the relevance statute is to consider those

17   aspects of this defendant.

18           THE COURT:  Okay.  So in terms of the, the history

19   and characteristics of the Defendant as opposed to the history

20   and characteristics of the offense?

21           MR. LAUER:  Yeah.

22           THE COURT:  Okay.

23           MR. LAUER:  And in addition, and I mean, well --

24   okay.  There are a number of factors that I'd like to review.

25   For instance, shared and counsel has included in the

1  government's sentencing memo a number of texts or

2  conversations, chats.  I think it's meaningful just to try to

3  get one's head around the house, something like this would

4  happen with him that he repeatedly asked questions of the other

5  members of this awful group about how to do things.  And I'm

6  asking you to simply bear that in mind because what I have come

7  to see and I'll try to justify that in a moment is somebody for

8  some reason who felt the need for companionship, whatever, got

9  involved in this group eight days before it ended and the

10  Defendant has said and the government has no evidence to refute

11  that he was in it for eight days.

12        This is the time period on which he did these things

13  and they're wrong, they're horrific.  And no one is suggesting

14  that you should walk away from it.  What I am suggesting though

15  is, yes, the guidelines take into consideration what someone's

16  criminal history is, but I also think it's important to know

17  that this is someone who hasn't done anything done anything

18  similar ever.  And in fact, with respect to the family

19  relationship that he had when these events occurred, everybody

20  including his former wife were very happy with him.  He was

21  helping them in many different ways.

22        So, what's the meaning of all these?  Judge, yes, you

23  could respond with life and it would be a sentence which would

24  be in compliance with the guidelines, but as we have suggested

25  in our memo, there is a requirement that a district court must

1   impose a sentence sufficient, but not greater than necessary.

2   And the third circuit has gone on to say that -- has gone on to

3   define all of that pretty thoroughly.  It has to be the

4   sentence which is minimally sufficient to achieve the stated

5   purposes of the sentencing.

6        The guideline range, I agree is what it has been

7   stated to be.  I also identify for you some research indicating

8   that the guidelines may not have been these guidelines; child

9   pornography guidelines may not have been added in a, in a

10  manner which was thoroughly resourceful that was looking at

11  everything possible.

12       THE COURT:  Wasn't that research really focused on

13  the consumption offenses as opposed to the manufacturing and

14  distribution offenses?

15       MR. LAUER:  I -- my understanding, Your Honor, was

16  that it applied to all the offenses.  I agree that the most

17  horrific outcomes initially were simply the possession offenses

18  not the manufacturing offenses.  But in that regard, counsel

19  points out to you in their sentencing memo, and I think

20  somewhere around Page 4, a number of cases in this district

21  where people got extremely serious and in one case, life

22  sentences for similar conduct, meaning production and

23  distribution.

24       However, I would, I would hope that you would look

25  briefly at the cases that were recited, for instance, one of

1   the first ones, US versus Crap [phonetic].  That's a case with

2   24 counts.  There was a 14-year-old victim who was sexually

3   assaulted and videoed over a period of time from May 13 -- May

4   of 2013 to October.  It happened eight times, it involved oral

5   sex, anal sex, digital penis -- penetration and it also ended

6   up that this individual had five other victims over a period of

7   nine years.  That person got life.

8           Another one was a gentleman whose last name was

9   Warman, W-A-R-M-A-N.  That individual had seven victims over

10  nine years.  He was charged with 51 counts of producing.  He

11  had for what it's worth 11,000 videos in his possession when

12  his area was searched and 1.2 million images of sexual

13  situations with children.  That individual got 120 years.

14          Mr. Jameson had an interaction with a 15-year-old

15  that went on for a period of looks like just over four months.

16  That involved ongoing vaginal and oral sex.  It involved --

17  which occurred according to the victim and the Defendant,

18  multiple times.  There were a thousand DVDs in his possession,

19  50,000 images.

20          And on it goes.  Mr. Brown had a teenage female

21  victim where he sexually abused her multiple times over March

22  of 2015 through July of 2016.  He had a thousand CDs and he had

23  multiple videos and images.

24          I'm not saying that my client's action isn't, isn't

25  something that requires frankly punishment by you.  I am saying

Proceedings                                    23

1  though that the suggestion that this type of sentence without

2  variance is something which has been imposed in this district

3  under cases where there was actual sexual assault, actual

4  penetration of various different ways of people who weren't

5  asleep while their father was doing these horrific things.

6          In cases where it wasn't over in eight days and

7  parenthetically with respect to it being over in eight days,

8  which there had been suggestions maybe it wasn't accurate, Your

9  Honor, the Defendant when he was interviewed said to the

10  police, I think it was originally police but it may have been

11  originally Federal officers, originally said that he had done

12  this. He admitted it and he also said that it made him sick

13  and he decided not to do it anymore and he deleted it from his

14  phone.

15          Now, one could say that since this search and this

16  statement by defendant is occurring very shortly after the last

17  time anything was posted, that maybe it only stopped because

18  they came and arrested him, except when they did take his phone

19  it had in fact been deleted.

20          So, I think it's important to note that while this

21  man is responsible for conduct which he can't even really talk

22  about without feeling like you don't want other people to hear

23  it, he did it. He did it for a week. He did it for stupid

24  reasons, and when he got his head around it, he stopped it and

25  walked away from it. This was not multiple victims over

Proceedings                                              24

 1  multiple months with multiple types of sex abuse all being

 2  videoed.  That would [inaudible] people the kind of sentences

 3  that counsel is encouraging you to give.

 4           I would -- I guess I have to say that I also thank

 5  the description of judge -- I'm sorry, judge, I didn't mean to

 6  say that.  Dr. DiTullio of his report being somehow missing

 7  things it should do.  I would say about Dr. DiTullio whom I've

 8  known for many years.  He is highly regarded in this part of

 9  the state.  He teaches frankly all over the world and he is

10  somebody who simply says is the way he sees it, and he saw that

11  there was some level of addiction here.  Addiction meaning not

12  just drugs but other things, which had to be addressed.  And he

13  also felt that at such time as Luis is no longer in custody,

14  that there should be a follow up to make sure that nothing is

15  going wrong.  But he also indicated as I've articulated in my

16  report -- sorry, in my memo.  I quoted a number of things that

17  he had to say in this regard.

18           I -- sorry.  I'm just -- I guess, Your Honor, I'm

19  asking you to acknowledge, which you must, the seriousness of

20  the nature of this type of case.  And I'm also asking you to

21  acknowledge and consider that even in serious cases, even in

22  cases where, where descriptive language about what occurred

23  gets kind of ugly, even in those cases, a variance is

24  appropriate if as in this case we are talking about somebody

25  who for a short period of time got involved in this horrific

1  stuff and then tried to walk away from it, obviously not soon

2  enough.  And it -- we are not in that same category as those

3  cases where people have had to essentially look forward to

4  nothing more than dying in prison.

5          I recited a number of conclusions that Dr. DiTullio

6  did reach.  He found that he expressed his remorse and disgust

7  for his behaviors, he was -- he found him to be amenable to

8  treatment and rehabilitation.  He found that with respect to

9  finding an actual psychopathic illness, there wasn't one, but

10  he did find that he had an unspecified personality disorder.

11  And he also concluded, "It is therefore my opinion to a

12  reasonable degree of psychological certainty that while Mr.

13  Perez-Rodriguez has engaged in horrible acts of exploiting his

14  own children for his personal gain and demonstrates a deviant

15  sexual arousal pattern to older adolescent females, he is a

16  good candidate for rehabilitation and is amenable to

17  treatment."

18          And then there is a final paragraph which I won't

19  read to you but it's on Page 9 of our sentencing memo talking

20  about this gentleman's ability in general to be able to get

21  this behind him and move on.  I will also point out to you the

22  items that we have listed in our memo dealing with the fact

23  that actually in child pornography cases, the level of

24  recidivism is extremely low and I think that's a factor to be

25  taken into consideration.

1           Without going into too much more, Your Honor, I think

2   it's -- everyone can agree that harm has been done here, that

3   there is a price that has to be paid and while I was promoting

4   a decade and-a-half, if more is needed, fine.  I respect the

5   Court's judgement in that regard, but I am suggesting that

6   while it was wrong, this young man knows it was wrong,

7   acknowledges the need for a penalty, a guideline sentence in my

8   opinion would be hugely disproportionate and frankly

9   unwarranted in this case.  It is not the minimally sufficient

10  response by this court.  And respectfully I encourage a

11  variance in this case.  I have suggested the 15 years because

12  frankly maybe it's my age speaking, 15 years sounds like a very

13  long time, but having said that, I obviously trust Your Honor's

14  judgement in that regard, but I think a sentence that allows

15  him at some point to come back to this community and redo some

16  of these stuff that he did well and try to undo the harm that

17  he did, but no sit there forever.  Respectfully, we are

18  encouraging a variance.

19           THE COURT:  Okay.  All right.  Thank you, Mr. Lauer.

20  Mr. Perez- Rodriguez, at this point, you have an opportunity to

21  step up to the podium and just say anything to me that you want

22  me to hear that you think would bear on my sentencing decision.

23           THE WITNESS:  Thank you, Your Honor.  Your Honor, I

24  want to thank you for the time and thank you for the

25  opportunity to speak.  I want to take the opportunity to

Proceedings                                27

```
 1   apologize to not only this court, my community, to the women,
 2   and to the young ladies that I've once had the privilege to
 3   call my daughters.  I know I've failed them.  I should have
 4   been there and protected them and not violate that trust.  I
 5   want to take the time to apologize to their mothers.  We had a
 6   decent relationship at the time and I also felt hurt too.  I
 7   should have been someone who should have been there to protect
 8   them and I violated that bond.  And I want to apologize for any
 9   harm I may have caused them directly or indirectly.  I'll like
10   fore them to know that I'm not only remorseful, but I'm ashamed
11   and I'm disgusted after I've gone through the chats and
12   realized the things that I was doing and the things that I
13   said.
14           I now know after studying similar cases, the
15   potential repercussions texts to repercussions of my actions
16   and the effects that could have had on them.  And I want to
17   apologize and I pray that if I did hurt them, which I know I
18   now see, it doesn't affect them in the long-term emotionally or
19   mentally.
20           I'd like to take the time to apologize to my parents.
21   They worked hard and did the best they could for me and my
22   actions in no way reflects my upbringing.  I hope that by the
23   time I am released I have a few more years with them to show
24   that I appreciate them for all they have done and that I am not
25   the person that I used to be once.
```

1          Lastly, I wish to apologize to this court and my

2    community for contributing as another statistic, and now as a

3    burden.  Once I'm done paying my dues to society, I plan on

4    finding a way to positively contribute back to my community.

5    Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Perez-Rodriguez.  All

7    right.  I'm going to take five minutes to think about all these

8    before I pronounce sentence.  So don't go far.  I'll be back.

9    I'm just going to leave the clock in here.  Probably at 2:30.

10   Okay.

11         MR. LAUER:  Oh, Your Honor.

12         THE COURT:  Yeah.

13         MR. LAUER:  I'm sorry, one -- my apologies.  I -- we

14   did have one witness who intended to be here, but it turns out

15   because of her work schedule she can't be here.  She had

16   written a letter which I've shared with counsel and I'm

17   wondering if I could --

18         THE COURT:  Yeah, hand it over to Ms. Roberts,

19   please.  All right.  Well, so yeah.  Break of five minutes.  I

20   think I'm going to read this too, but it's going to take me

21   only a few minutes, but don't go far.  Okay.

22         COURTROOM DEPUTY:  All rise.

23         [Recess]

24         COURTROOM DEPUTY:  All rise.

25         THE COURT:  All right.  Have a seat please,

1   everybody.  I just want to point out it's a technical point of

2   clarification that I just have.  Ms. Jones maybe knows the

3   answer.  So I have to order this mandatory minimum restitution.

4   To whom does it get paid?

5           MS. JONES:  Your Honor, I apologize, I do not know

6   the correct answer to that.

7           THE COURT:  Okay.  I mean, I know in the first

8   instance, is it payable to the clerk of the US District Court

9   [inaudible] for whom it's distributed, right?  Ms. Maxwell, do

10  you know by chance?

11          MS. MAXWELL:  Typically, Your Honor, if the

12  government doesn't have the information at sentencing, then

13  it's something that the Court can order at this point that it's

14  distributed by the district -- by the clerk's office.

15          THE COURT:  Right.

16          MS. MAXWELL:  The government can provide --

17          THE COURT:  Okay.

18          MS. JONES:  Oh, okay.  That's cool.

19          THE COURT:  That's fine.  So I'll just -- I'll order

20  the payable to the clerk's office with distribution information

21  to be provided by the US Attorney's office.

22          MS. MAXWELL:  Correct.

23          MS. JONES:  Thank you, Your Honor.

24          THE COURT:  Okay.  All right.  Okay.  So I've thought

25  about everything I've heard.  Mr. Perez-Rodriguez, you've heard

1  reference to 3553(a,) that's the statutory section.  It

2  specifies the various things that I had to consider when

3  pronouncing sentence in this case or any case for that matter.

4  And you know, I've read everything pretty carefully coming into

5  today, I've read it multiple times, I've listened to what I've

6  heard here.

7           This offense, it's a special kind of evil.  There are

8  some lines you just don't cross and this is one of them.  Mr.

9  Perez-Rodriguez, you took advantage of two little girls who not

10 only couldn't take care of themselves, but who relied on you to

11 take care of them.  And you took advantage of them at the

12 moment which they were most vulnerable which was when they were

13 asleep.  I think your statements to me minimizes what you did.

14 You said you had to go through the chats to realize what you

15 did and how it was wrong, but it shouldn't take that.  The

16 chats in which you engaged are horrific.  They are a window

17 into your thinking in my mind because unlike what you said to

18 the police, or to Dr. DiTullio, or anyone else, they came at a

19 time when you weren't under supervision, hadn't pled guilty and

20 weren't facing the music, so to speak.

21          I mean, this is a crime that makes me cringe reading

22 through these chats, reading through the information both in

23 preparation for the guilty plea and today, it makes my stomach

24 churn.  It's actually worse than that.  It's not just the

25 abuse, it's not just the manufacture.  I read Dr. DiTullio's

1    report pretty carefully and one thing that jumped out of me,

2    and I don't credit everything in that report, but the one thing

3    that jumped out of me was that you didn't do this because you

4    were titillated by the contact with/or images of your

5    daughters.  You did it as currency to get images of older girls

6    that were of value to you.  And it's presented in Dr.

7    DiTullio's report as some part of mitigation of what you did,

8    but I don't see it that way.  I see it as worse.  That you

9    would be willing to trade images of your girls and to disregard

10   the harm that you were going to do to them just to get

11   something of value to them.

12          Being responsible for someone, being a parent, being

13   in charge, means you subjugate your needs to them.  You don't

14   elevate it, and you certainly elevated them in this way where

15   you damaged them.  That's just not acceptable.  And from what

16   I've read, it seems that you knew what you were doing was

17   wrong.  You tried -- in the course of the chat, there is an

18   acknowledgement that you were hiding it from the girls' mother.

19   You lied to the police about it.  From where I sit, everything

20   that I've seen has been an effort to dunk full responsibility

21   for it.

22          You say it made you sick to read the chats, but that

23   same nauseous should have happened when you thought about doing

24   this, not after.  That's not the time and that's not something

25   that it took some pause and late of day to realize the harm or

1    the wrongness of.  It's just as I said at the start, plain

2    evil.  And you know, pleading guilty when there might not be

3    much of a defense to the case anyway doesn't really move the

4    needle for me in terms of showing you're accepting

5    responsibility here.

6             I'm going to go on.  I'm going to talk about the

7    other factors I have to under the statute.  Frankly, some of

8    them exacerbates my conclusion, few of them mitigate them, but

9    I'm not sure that any of them would matter given the nature of

10   this crime and the offense.

11            The next factor is the history and the

12   characteristics of the Defendant.  There is nothing in Mr.

13   Perez's background that I see that mitigates this even a little

14   bit.  This isn't someone who is damaged by his own past, this

15   isn't someone who is engaged in conduct that was motivated in

16   some respect by economic necessity.  Mr. Perez-Rodriguez, you

17   had a stable upbringing.  In a lot of sense, you were lucky,

18   luckier than a lot of people currently in front of me.  I don't

19   credit what Dr. DiTullio says about addiction.  Drug addiction,

20   I mean there's lots of people out there who are addicted to

21   drugs who use marijuana, who use steroids; they don't cross

22   these lines.  There's no linkage that I can see.  Even being a

23   sex addict, assuming I credit that as being the case, that

24   doesn't get to taking the advantage of little girls especially

25   ones who are, who are your daughters.  So I don't see anything

1  in your background that, that mitigates this.

2          The third factor for me to consider is the need to

3  reflect the seriousness of the offense, to promote respect for

4  the law, and to provide just punishment.  I heard Mr. Lauer

5  talk about just.  To me, we have different conceptions of what

6  just is in this case.  I think it's important to let everyone

7  know that what happened here is not okay.  This, this kind of

8  conduct just, it has no place in our society, period.  Couple

9  that with the fact that there was damage, real lasting damage

10 that was done to these girls.  I don't know that that damage

11 would be ameliorated in 15 years and so, reflecting the

12 seriousness of the offense, the punishment should last, I

13 think, as long as that damage does, and I don't know when that

14 would be over.

15         Deterrence; you know, there is some discussion in the

16 sentencing memos about deterrence and I see this time and again

17 as an argument.  I don't know for certain that heavy sentences

18 deter this conduct.  Maybe it's only on the margin.  But it

19 doesn't hurt.  I do think that to the extent anyone is debating

20 this and knows how seriously the courts take it, that that's

21 not a bad thing.  And Congress has told me I have to think of

22 the deterrent, so I just can't ignore it.  But again, I think

23 deterrence matters here and I'm talking of really general

24 deterrence as much as specific deterrence.

25         General deterrents being the effect on other members

1    of the public.  I have to protect the public from further

2    crimes of the Defendant.  I do think it's an issue, Dr.

3    DiTullio's report says it's an issue.  Any time Mr. Perez-

4    Rodriguez comes back out, I think he's a threat.  That may just

5    be because he's consuming this type of material, but as the

6    Supreme Court has acknowledged, consumption drives demand.  But

7    it's more than that.  Again, I go back to this notion that this

8    was just trading in currency and a willingness to do that, and

9    someone who's willing to do that strikes me as an ongoing

10   threat [inaudible] to acknowledge.

11          The next factor I need to consider is to provide

12   educational or vocational training, medical care, or other

13   correctional treatment.  Therapy may be helpful here and

14   certainly I can hope that Mr. Perez-Rodriguez gets it, but it

15   is less important here given the sentence.  I'm contemplating

16   and I don't see the need for medical care or correctional

17   treatment as being terribly important here.  I certainly

18   considered the kinds of sentences available.  Obviously, this

19   is a sentence that requires incarceration.

20          Guideline ranges, I've considered.  Policy

21   statements, I've considered.  I've thought about -- thought

22   hard about the analysis and research that the defense has cited

23   to me about child pornography cases and I do think that mostly

24   is about consumption crimes and about the impact the, perhaps

25   the availability on the internet and does that ease the

1  dissemination and things like that has affected this.  I don't

2  see those -- that research as terribly on point for this kind

3  of crime.  And whether it's on point for some other abstract

4  manufacture or distribution crime, I don't have to decide now.

5  But for this particular crime, for taking advantage of

6  someone's daughters and trading in currency, I don't see that

7  anything in the guidelines is overstating the severity of the

8  crime.

9           I have to avoid sentencing disparities.  I have

10  considered that.  I've looked at similar cases in this district

11  that the government has pointed out.  I have looked more

12  generally at some of what the Federal Judicial Center puts out

13  on these kinds of crimes as well.

14           And the last thing for me to consider; restitution.

15  As we've talked about, restitution is mandatory in this case

16  under 18 U.S.C 2259.  There's no specific request from the

17  victims so I'll award the statutory minimum of $3,000 per

18  victim.

19           Ultimately, where I am on all these, I think I've

20  said I mean, pretty clear a heavy sentence is warranted.  I

21  frankly think these girls would be better off if they can do

22  what they can do to wipe Mr. Perez-Rodriguez from their lives

23  without the possibility of him returning to them, and I guess I

24  should have mentioned that as I was running through the factors

25  that if he gets out in 12 to 15 years, the possibility of him

1  trying to make contact with these girls whether there's a

2  conditioned supervised release or otherwise is also very

3  troubling to me.

4         I'm not overall impressed with Dr. DiTullio's report.

5  It does -- I had the same reactions the government had, it

6  blindly accepts what Mr. Perez-Rodriguez says and it doesn't

7  really show a link between the addictions and Mr. Perez-

8  Rodriguez's conduct.  Frankly, when I read the report, it

9  struck me as something where an expert had started with the

10 conclusion knowing who was paying him and then did the analysis

11 designed to get there.  And as the government points out, the

12 sentencing recommendation in that report are inconsistent and

13 they acknowledge Mr. Perez-Rodriguez's continuous risk of

14 recidivism.

15        I -- as I think about the appropriate sentence with

16 the factors that the defense has outlined, again, I come back

17 to this notion of engaging in this as a form of border, as a

18 form of commerce, it's just -- it's really cold-hearted, it's

19 really troubling and it tells me that Mr. Perez-Rodriguez

20 really didn't have any regard for these girls.

21        Finally, I'm just not impressed by the idea that this

22 occurred over a short time.  I don't know if Mr. Perez-

23 Rodriguez stopped.  I don't know if he stopped because you

24 thought you were going to get caught or because you just

25 decided to step away.  But again, there's lines you just don't

1   cross and this is just one of them.  I don't know if he would

2   have gone back to it, it strikes me as not unlikely.  And in

3   other words, I think there it was -- there was a pretty high

4   possibility that once you are there once you will go back.  I

5   do know that regardless of how long this all lasted, you

6   engaged in this conduct without any regard to the harm that you

7   were inflicting on your daughters and at that short period of

8   time doesn't really mitigate the harm that you did to them.

9   And so all of that informs the sentence that I'm going to

10  pronounce here.

11          So, pursuant to the Sentencing Reform Act of 1984, it

12  is the judgement of the Court that the Defendant, Luis Perez-

13  Rodriguez is hereby committed to the custody of the Bureau of

14  Prisons to be imprisoned as follows: 30 years on Count 1 and 20

15  years on Count 5 to run concurrently with each other.  30 years

16  on Count 2 and 20 years on Count 6 to run concurrently with

17  each other and consecutively to the sentence on Counts 1 and 5.

18  30 years on Count 3 and 20 years on Count 7 to run concurrently

19  with each other and consecutively to the sentences on Counts 1

20  and 5, and 2 and 6 respectively.  And 30 years on Count 4 -- 30

21  years on Count 4 and 20 years on Count 8 to run concurrently

22  with each other and consecutively to the sentences on Counts 1

23  and 5, 2 and 6, and 3 and 7 consecutively.

24          So, that's a total sentence of 120 years or 1440

25  months.  That doesn't leave a lot of possibility for supervised

1    release but because there is a mandatory supervised release,

2    I'm going to impose it and upon release from imprisonment,

3    defendant shall be placed on lifetime -- a lifetime of

4    supervised release.  This term consists of terms of lifetime

5    supervision om each of Counts 1 through 8, all terms to run

6    concurrently.

7            Within 72 hours of release from the custody of the

8    Bureau of Prisons, the Defendant shall report in person to the

9    probation office in the district to which the Defendant is

10   released.  While on supervised release, the Defendant shall not

11   commit another federal, state or local crime.  He shall be

12   prohibited from possessing a firearm or other dangerous device.

13   He shall not possess an illegal controlled substance, and he

14   shall comply with the other standard conditions that have been

15   adopted by this court.  The Defendant shall corporate in the

16   collection of DNA as directed by the probation officer.  The

17   Defendant must submit to one drug test within 15 days of

18   commencement of supervised release and at least two tests

19   thereafter as determined by the probation officer.

20           In addition, the Defendant shall comply with the

21   following special conditions: the Defendant shall participate

22   in a sex offender evaluation and/or treatment and abide by the

23   rules of any such program until satisfactorily discharged.  The

24   Defendant shall participate in a mental health program for

25   evaluation and/or treatment and abide by the rules of such

1    program until satisfactorily discharged.  The Defendant shall

2    report to the US Probation Office any regular contact with

3    children of either sex under the age of 18.  The Defendant

4    shall not obtain employment or perform volunteer work which

5    includes regular contact with children under the age of 18.

6    The Defendant shall register with the State's sex offender

7    registration in any state where the Defendant resides, where

8    he's employed, or he carries on a vocation, or he is a student,

9    or is directed by the probation officer.  The Defendant shall

10   submit to an initial inspection by the US Probation Office and

11   to any examinations during supervision of the Defendant's

12   computer and any devices, programs or application.  The

13   Defendant shall allow the installation of any hardware or

14   software systems which monitor or filter computer use.  The

15   Defendant shall abide by the standard conditions of computer

16   monitoring and filtering that will be approved by this court.

17   The Defendant is to pay the cost of the computer monitoring not

18   to exceed the monthly contractual rate in accordance with the

19   probation officer's discretion.

20            Pursuant to 18 U.S.C Section 2259, the Court orders

21   the Defendant shall pay an assessment in the amount of $3,000

22   for Minor 1, $3,000 for Minor 2, which is due immediately.  It

23   shall be payable to the clerk of the United States District

24   Court.  The US Attorney's Office will provide information to

25   the clerk of the Court for distribution of the -- of that

1  restitution payment.  It's recommended that the Defendant

2  participates in the Bureau of Prisons inmate financial

3  responsibility program and provide a minimum payment of $25 per

4  quarter toward the amount due.  In the event that the

5  restitution is not paid prior to the commencement of

6  supervision, the Defendant shall satisfy the amount through

7  monthly installments of not less than $50 to commence 30 days

8  after release from confinement.

9          The Defendant shall notify the United States Attorney

10  for this district within 30 days of change of any mailing

11  address or residence that occurs while any portion of the

12  restitution remains unpaid.

13          The Court finds that the Defendant does not have an

14  ability to pay the $5,000 JDTA assessment and waives the

15  assessment for each of Counts 1 through 8.  The Court further

16  finds that the Defendant does not have the financial ability to

17  pay a fine and waives the fine in this case.  It's further

18  ordered that the Defendant shall pay the United States a total

19  special assessment of $800 which shall be due immediately.  All

20  right.  That's my sentence.

21          Mr. Lauer, anything that I need to cover in the way

22  of recommendations or anything along those lines?

23          MR. LAUER:  No, Your Honor.

24          THE COURT:  Okay.  Then Mr. Lauer, I'm going to ask

25  that you give Mr. Perez-Rodriguez his appellate rights.

1          MR. LAUER:  We have discussed it, yes.

2          THE COURT:  Well, I'm going to ask that you just

3    recite them on the record for him.

4          MR. LAUER:  Okay.  Your Honor, may I, may I just have

5    a brief moment with counsel?

6          THE COURT:  Sure.

7          [At Sidebar]

8          [Conclusion of Sidebar]

9          MR. LAUER:  Your Honor, would you want me to do this

10   with questioning or just state them --

11         THE COURT:  You can just recite them and then we'll

12   just make sure that Mr. Perez-Rodriguez understands.

13         MR. LAUER:  Okay.  Luis, do you understand that you

14   have the right to file motions, [inaudible] motions challenging

15   the legality or propriety of any portions of this sentence?

16         THE WITNESS:  Yes, sir.

17         MR. LAUER:  And that there is a, I believe, 14-day

18   period within which that can be filed?

19         THE WITNESS:  Yes.

20         MR. LAUER:  And you and I will speak further about

21   that after today's proceedings.  You also have a right

22   depending upon the disposition of those motions or other

23   proceedings if you file them, you also have a right to pursue

24   and appeal, if that as appropriate, and you and I will discuss

25   that further.  Do you understand that?

1            THE WITNESS:  Yes.

2            MR. LAUER:  Do you understand the sentence that the

3   judge imposed?

4            THE WITNESS:  Yes.

5            MR. LAUER:  I, I think that's it, Your Honor.

6            THE COURT:  Okay.  And Mr. Perez-Rodriguez, just to

7   be clear, you understand you have 14 days to file an appeal in

8   this matter?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  And you understand that you can let Mr.

11  Lauer know that if you want to do that, then he can do that on

12  your behalf; do you understand that?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  You also understand that you have the

15  right to counsel for an appeal and if you can't afford a

16  lawyer, one can be appointed for you and that person can then

17  file a notice of appeal, but all that has to happen within 14

18  days; do you understand all that?

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  Okay.  Anything else on appellate rights,

21  Ms. Jones, that I need to cover?

22           MS. JONES:  No, Your Honor.  I believe that was

23  everything.

24           THE COURT:  Okay.  All right.  Then I think we are

25  through.  Anything else from the government's perspective that

Proceedings                                    43

1  I need to tackle, Ms. Jones?

2             MS. JONES:  No, Your Honor.

3             THE COURT:  Okay.  Mr. Lauer?

4             MR. LAUER:  No, Your Honor.

5             THE COURT:  Okay.  Then we'll stand adjourned.  All

6  right.  Thank you, everybody.

7             COURTROOM DEPUTY:  All rise.

8             THE COURT:  Sorry.  [Inaudible].

9             MS. JONES:  [Inaudible] Your Honor, I apologize.

10             THE COURT:  Well, if you did [inaudible] and you're

11  not waiving it --

12             MS. JONES:  Right.

13             THE COURT:  -- [Inaudible] covered in the guilty

14  plea.  Right.  I would have asked -- it's a standard part of my

15  colloquy that I would have asked Mr. Perez-Rodriguez whether he

16  understood that there was a request for [inaudible] and that he

17  was agreeing to it.  And so you just --

18             MS. JONES:  Can we just make sure it's final, Your

19  Honor, that's all that I would ask?  That's all --

20             THE COURT:  Yes.  So that you'll just need to file

21  the appropriate notices in due course.

22             MS. JONES:  Thank you, Your Honor.

23             THE COURT:  Okay.  All right.

24             COURTROOM DEPUTY:  All rise.

25                          *  *  *  *  *

## **C E R T I F I C A T I O N**

We, Ubique Reporting, Inc., court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


Lawrence Ekworonu


DATE:  October 6, 2023